STEVENS CONSTRUCTION CORPORATION, Plaintiff and Appellant, v. CAROLINA CORPORATION and others, Defendants and Respondents: HARDWARE MUTUAL CASUALTY COMPANY, added Defendant. [Case No. 253.]

STEVENS CONSTRUCTION CORPORATION, Plaintiff and Appellant, v. GRANDLICH and others, Defendants and Respondents: CONCRETE RESEARCH, INC., and others, Third-Party Defendants. [Case No. 254.]

STEVENS CONSTRUCTION CORPORATION, Appellant, v. ELRUTH CORPORATION and others, Respondents. [Case No. 255.]

*Nos. 253–255. Argued April 1, 1974.—Decided May 7, 1974.*
(Also reported in 217 N. W. 2d 291.)

344

For the appellant there were briefs by *Cook & Franke, S. C.,* attorneys, and *John J. Ottusch* of counsel, all of Milwaukee, and oral argument by *Mr. Ottusch.*

For the respondents there was a brief by *Axley, Brynelson, Herrick & Gehl* of Madison, and oral argument by *Griffin G. Dorschel* of Madison.

HANLEY, J. The following issues are presented by this appeal:

1. Did the trial court err in concluding that Stevens had breached its contract in failing to furnish a properly designed prestressed concrete structure?

2. Did the owners of Normandy Apartments waive the construction defect by failing to object thereto?

3. Did the trial court err in finding that the repair contract between Stevens and the owners failed for want of consideration?

4. Is Stevens entitled to prejudgment interest?

5. Did the trial court err in concluding that Stevens had substantially performed the contract?

The defendants herein became involved in the construction of apartment dwellings in Dane county with the construction of the Carolina Apartments located in Madison's University Hill Farm area. The construction and operation of the Carolina Apartments proved so successful that in 1968 the defendants conceived the idea of constructing the Normandy Apartments.

The Carolina Apartments and the Normandy Apartments are located in the same general area on approximately 6.2 acres of land. The apartment projects are basically similar in design—each consisting of three buildings of similar construction. The apartment projects both consist of three-story ordinary construction buildings with basements and underground parking. The general contractor for both the Carolina and Normandy Apartments was Stevens Construction Corporation.

Defendants contacted Frank Leach and retained him for the performance of limited architectural services. Mr. Leach was not involved in the construction of the Carolina Apartments.

The architectural services contracted for from Mr. Leach were limited solely to doing the architectural design, layout of the stall exits in the basement, do the working drawings and specifications, engineer the wooden structure and flooring and footings and make periodic inspections and act as project professional to channel all related architectural information promptly. The reason the owners contracted for such limited services was economic. Generally, the precast concrete manufacturers and other subcontractors such as heating or electrical do their own design and engineering and by so contracting with the general contractor or subcontractor that such design and engineering services would be performed by them and by excluding those services from the duties of the architect, the owners could avoid duplication of services. Such avoidance of duplicative services saved the owners in excess of $85,000.

At the time Leach was preparing the general architectural design, the defendants contacted Stevens Construction Corporation in an attempt to retain them as general contractor. The reasons for contacting Stevens were because of the fact that Stevens had been general contractor for the Carolina Apartments and because of Stevens' multiple capabilities.

Stevens Construction Corporation is a corporation engaged in general construction work. Stevens and Collings Engineers, Inc.,—a corporation involved in structural engineering—are generally interrelated corporations and are principally owned by Mr. Gene Grotenhuis. Stevens and Collings operated "as one" in numerous construction projects—Stevens performing the general contractor's duties and Collings the structural engineering duties. Employees of Collings Engineering, Inc., are often loaned to Stevens Construction Corporation—such as Mr. Donald Lucas, a structural and civil engineer who was on loan to Stevens during construction of the Normandy Apartments—during a project in which Stevens was the general contractor.

After Leach had provided the owners with a site plan and a basic idea of the project concept, the negotiations with Mr. Grotenhuis of Stevens intensified. During those negotiations, Mr. Mohs testified, Mr. Grotenhuis stated that the Normandy contract would be the same as the Carolina contract. On the Carolina project Stevens acted as general contractor and in addition performed the structural engineering for that project. Stevens was required to furnish the concrete system and its subcontractor was Spancrete, Inc. The structural engineering for the Carolina project was performed by Collings through Spancrete.

The parties continued to work closely together concerning design and economics of the project. One specific aspect of that design—the prestressed concrete structure which was to support the project in general—was originally to be let to Spancrete for a system similar to that incorporated in the Carolina project. The "Spancrete" system was called for in the first architectural plans. Since Spancrete had a more expensive system than Concrete Research, the owners were induced to accept the latter. Stevens contacted Concrete Research, gave them the architect's plans and informed them to submit a design proposal for consideration. All parties knew that

design responsibility for such a system rested in the end with the subcontractor because of the limited services exacted for the owner's architect.

Concrete Research, Inc., had a registered structural engineer on its staff named Mr. Ellenbeck. He examined the architect's plans and designed the prestressed concrete beams, columns and planks necessary to support the area between the arms of the U-shaped building C of the Normandy project which had been dug out and was to be used for tenant parking. In so designing the prestressed concrete structure and preparing the shop drawings and structural calculations, Mr. Ellenbeck made a drastic mistake. Ellenbeck designed the beams of the prestressed concrete system to hold 120 pounds per square foot less than that called for. Since there is a 70 percent safety factor built into such calculations, however, the mistake was not readily observable, even after construction. These shop drawings were then given to the owners who accepted them and the architect who incorporated them in the plans. Mr. Grotenhuis of Stevens informed the owners that Concrete Research's plan would be structurally right in terms of design.

Construction was begun in the fall of 1968. Stevens had orally agreed to act as general contractor and the principal subcontractors had been selected. However, because of several contractual details that were yet to be worked out, work was started without a written contract. In May or June, 1969, the contract was finally completed and signed by the parties. The contract was, however, backdated to November 1, 1968, to approximate the date construction had commenced.

After the prestressed concrete substructure was designed and installed, the owners decided to modify the original concept by placing larger planters on the patio deck which the structure supported. At this time, the subcontractor had completed his work and was no longer present. The new planters were incorporated into the

drawings and installed without structural testing. The result was a cracking of the beams above the columns. While the original structure was sorely tested because of the miscalculation of Concrete Research, the structure remained erect. However, when the plans were changed and new planters installed, the actual load on the system was 456 pounds per square foot. Since the original mistaken design could withstand only 290 pounds per square foot (170 pound design plus 70 percent—120 pounds—safety factor), the beams cracked and yielded.

The design error of Concrete Research, Inc., Stevens' subcontractor, was for the first time discovered. Previous to the addition of the larger planters, the error was latent and could not be discovered except by a person of design engineering competence. Since the owners' architect lacked design experience, the defect was undiscoverable. Upon discovery, the owners demanded that Stevens, Concrete Research and Leach remedy the situation without cost in that the construction contract called for the correction of such defects by the contractor. The contractor and subcontractor refused.

Initially the owners agreed to allow Stevens and Concrete Research to correct the defect and so contracted via a cost plus agreement. The owners became dissatisfied with Stevens and Concrete Research's repair work and ordered them to cease. The repair work done by Stevens to this time was reasonably valued at $3,136.51. A Madison structural engineer was retained, Mr. Thomas O'Sheridan, and repairs were made. These repairs were reasonably valued by the trial court at $21,518.63. In addition, the trial court found the reduced utility and economic value of the basement and building was $3,000. This amount was based on reduced space for parking facilities.

*Stevens' responsibility for "design."*

The trial court found in the present action that the plaintiff, Stevens Construction Corporation, had contract-

ed to furnish and install a properly designed prestressed concrete system sufficient to support the weight which the architectural plans and specifications showed would be placed thereon when the building was complete. The trial court based this finding that Stevens had contracted to furnish and install a properly designed prestressed concrete system on

". . . the contracts, the circumstances surrounding their execution, the specifications of the architect (Precast Concrete) and the practical construction placed thereon by the parties, . . ."

This, Stevens contends, was error.

Initially, it is undisputed that Stevens Construction Corporation and its subcontractor, Concrete Research, Inc., did design the prestressed concrete system incorporated in the Normandy Apartments. It is also undisputed that the prestressed concrete system was improperly designed and that the improper design was the cause of the damage incurred by the owners of the Normandy Apartments. Thus, the only question to be resolved on the first issue is whether Stevens and its subcontractor had a duty, contractual or otherwise, to properly design the prestressed concrete system.

The plaintiff contends that it did not contract with the owners to undertake design responsibility for the prestressed concrete system. Rather, it contends, its contractual responsibilities were limited by contract to merely furnishing and installing a prestressed concrete system designed by the owners' architect. Since, Stevens continues, it had no design responsibility, then there exists no liability for the consequence of design errors. *Fritz v. Woldenberg* (1929), 199 Wis. 99, 225 N. W. 700; *Bentley v. State* (1889), 73 Wis. 416, 41 N. W. 338. Reliance by Stevens on *Fritz* and *Bentley* for the proposition that it is without responsibility for the consequence of design errors is, however, misplaced. In both *Fritz*

and *Bentley* the design responsibility was placed on a third party and thus there existed no liability on their part for the design error of another. In the present action the trial court found that Stevens had contracted to furnish and install a properly designed prestressed concrete system. Thus reliance on *Fritz* and *Bentley* is unavailing.

The parties herein executed a standard form AIA contract whereby the plaintiff agreed that:

> "**Article 1.** *Scope of the work*—The Contractor shall furnish all of the material and perform all of the work for General Construction and Mechanical work including Heating, Ventilating, Plumbing and Electrical, and Equipment as defined . . . as shown on the Drawings and described in the Specifications entitled The Normandy Apartments, Sheboygan Ave. and Segoe Road, Madison, Wisconsin prepared by Frank Leach, Architect, all in accordance with the terms of the Contract Documents."

This standard form contract incorporated therein generally standardized specifications whereby the contractor agreed to:

> "Furnish and install all present concrete columns, precast basement beams and Spancrete planks."

This contract was found by the trial court to be integrated.

On the basis of the integrated written contract Stevens contends that it is without design responsibility. If the trial court were limited solely to such evidence, plaintiff's contention would have merit. The trial court, however, concluded to the contrary, stating:

> "This agreement to furnish and install included a duty to perform on the specifications and so to furnish a product designed to include weight bearing capacity of its members sufficient to support the weight which the plans and specifications showed would be placed thereon when the building was completed."

In so concluding on the basis of the contract, the circumstances surrounding its execution, the specifications of the architect and the practical construction of the parties, we are of the opinion that the trial court was correct.

We are of the opinion that the trial court was not limited solely to the "four corners" of the contract. Both parties introduced evidence beyond the "four corners" of the contract. Stevens introduced "Article X" of the Carolina Apartments contract to show that paragraph 10 specifically provided that Stevens had agreed to design the Spancrete structure in the Carolina contract while the Normandy contract did not contain any parallel undertaking by Stevens.

While "parol evidence"—the circumstances surrounding the execution of the contract and the practical construction of the parties—may not be introduced to vary the terms of a written contract, it may be introduced to explain ambiguous terms of the written instrument. *O'Connor Oil Corp. v. Warber* (1966), 30 Wis. 2d 638, 642, 141 N. W. 2d 881. In the instant case the terms incorporated in the written agreement are latently ambiguous and parol evidence is admissible to clarify the existing ambiguity. *Conrad Milwaukee Corp. v. Wasilewski* (1966), 30 Wis. 2d 481, 141 N. W. 2d 240.

In *Klueter v. Joseph Schlitz Brewing Co.* (1910), 143 Wis. 347, 128 N. W. 43, this court stated in defining latent ambiguity and the admissibility of parol evidence to clarify it that:

"The words of a contract, in themselves, may be plain, yet when applied to the situation with which it deals, not plain, the literal sense leading to such unreasonableness as to suggest that the parties probably did not so intend.

". . .

"It is only where the words are 'plain, both in themselves and when applied to the subject with which they deal,' that they 'must be taken according to their ordinary import,' no other meaning being added thereto or taken therefrom. [Citation omitted.] Otherwise, "The

contract may be read very different from its literal sense' 'so long as its reasonable scope is not departed from, if necessary to give effect to what the minds of the parties really met upon.' " *Id.* pp. 353, 357.

*See also:* 32A. C. J. S., *Evidence*, p. 428, sec. 961, wherein an ambiguity is defined as latent:

"[W]hen it does not appear from the face of the instrument but is revealed by other evidence."

Applying such rationale, it is clear that the present contract is latently ambiguous. The contract calls for Stevens to "furnish and install all . . . precast basement beams." While such specifications appear clear on their face, when applying such language to the subject at hand, a patently ridiculous situation results—*i.e.*, the contractor is to furnish undesigned precast beams knowing the contractor's architect had no designing experience. Obviously, a literal reading of the contract which Stevens desires would lead to such an unreasonable result to suggest that the parties did not so intend. *Klueter v. Joseph Schlitz Brewing Co., supra.*

Likewise the circumstances surrounding the execution of the contract are enlightening in clarifying the ambiguity. Grotenhuis, Stevens' principal owner, was informed by the owners of their desire to avoid duplication of engineering services. Grotenhuis then contacted the subcontractors with this object in mind. Concrete Research was directed to prepare a design and the subcontract was let to them upon said design. Only after all of these events transpired was the formal standardized written contract entered into. Stevens chose to rely on the engineering that Concrete Research had done for the precast concrete system. Stevens exacted an indemnity agreement, to protect itself from Concrete Research.

We are satisfied that the trial court's conclusion with the duty to furnish and install the system included the duty of design.

*Question of waiver.*

The plaintiff contends that the trial court erred in refusing to apply the doctrine of *Laycock v. Moon* (1897), 97 Wis. 59, 72 N. W. 372, to the effect that where a contract for construction of a building provides that the proprietor or architect shall have full power to reject all work and materials which are not in compliance with the specifications of the contract, and where the architect so inspects and fails to promptly reject the unsatisfactory or defective construction, that the owner by the actions of his architect has waived the right to object to unsatisfactory or defective work. Since, the plaintiff contends, the defendants' architect had the right to accept or reject the work and since he failed to so object to "open and obvious" errors, the defendants have waived their right to require the plaintiff to remedy such defective construction.

The trial court found that the doctrine of *Laycock v. Moon, supra,* was distinguishable from the present situation and inapplicable. In *Laycock,* the defects complained about were that unsuitable stones had been used in the footing course of the foundation, that the walls had not been "slushed" with mortar, that the walls had not been "pointed" with mortar and that the walls had not been "cleaned" nor oiled or stained with "brick stain." The owners' architect made numerous inspections and all defects, in the words of the court, "were obvious to the stipulated inspection." *Id.* at page 63. If the obvious defects had been promptly and properly rejected, the court concluded, all faults or defects could have been corrected without loss or detriment to either party. Since failure to express dissatisfaction of the work as completed could be interpreted as acceptance and the builder lured on to complete the construction doomed to rejection because of a then easily remedied defect, the court held that such failure to object must be deemed to be a final and irrevocable acceptance of the work.

The "failure to object" as constituting either an express or implied waiver of construction defects is not, however, of absolute application. If the defects are hidden or latent and thus under the exercise of reasonable diligence unknown to the owner or architect, there cannot be implied a waiver on the part of the owner of construction defects. *Milwaukee County v. H. Neidner & Co.* (1936), 220 Wis. 185, 263 N. W. 468, 265 N. W. 226, 266 N. W. 238; *Fisher v. Simon* (1961), 15 Wis. 2d 207, 112 N. W. 2d 705.

The general contractor was herein aware of the limitations of the architect's duty to inspect the construction. He knew that the architect was unqualified to detect design engineering defects. Likewise, the general contractor was informed that his plans were approved only insofar as they were in conformance with the architectural concept. The plaintiff was not, therefore, lured into believing, as a result of the architect's actions, that his design engineering was acceptable only to later discover that such was not the case. Such not being the case, it would be improper to imply a waiver of the owner's right to remedial action on the part of the general contractor resulting from his breach of a contractual duty to design.

In the present action the trial court found that the defects were "latent and undiscoverable." Such a finding is supported by the evidence. The defects being "latent and undiscoverable," the trial court was correct in concluding that the doctrine of waiver did not apply.

*Repair contract.*

Stevens next contends that they are entitled to recover the sum of $3,136.51 which was, under contract, expended by them in providing support to protect the building after discovery of the construction defects and in attempting to remedy the defect. The trial court found that this work was "required under the contract in dis-

charge of their own duties to render such repair work following the breach of their contract." Stevens states that this trial court finding follows logically from the trial court's previous holding that Stevens had contracted to design the prestressed concrete structure. With this we agree.

*Prejudgment interest.*

In its order amending its original conclusions of law, dated May 31, 1972, the trial court ruled that prejudgment interest due from January 1, 1970, at a rate of one percent per month on Stevens' claim was not owing. Since the trial court concluded in its preliminary findings the plaintiff's claim was not liquidated:

"It is the considered judgment of the fact finder that these issues were genuine and difficult to resolve except with the aid of thirteen trial days. One could find little advice to aid in narrowing the issues and hence determine any probable amount due because the complicated interplay of the conduct of the parties required adjudication before the amount of indebtedness became apparent."

The trial court in concluding that the recovery of prejudgment interest by the plaintiff could not be recovered herein relied on the often stated Wisconsin law that prejudgment interest may be granted only when the claim is liquidated and, as such, subject to ascertainment with reasonable exactness. *Smith v. Atco Co.* (1959), 6 Wis. 2d 371, 94 N. W. 2d 697; *California Wine Asso. v. Wisconsin Liquor Co.* (1963), 20 Wis. 2d 110, 121 N. W. 2d 308; *Congress Bar & Restaurant v. Transamerica Ins. Co.* (1969), 42 Wis. 2d 56, 165 N. W. 2d 409; *Dahl v. Housing Authority of the City of Madison* (1972), 54 Wis. 2d 22, 194 N. W. 2d 618. The amount of plaintiff's recovery must be a fixed and determinate amount which could have been tendered and interest thereby stopped. *Bigley v. Brandau* (1973), 57 Wis. 2d 198, 203 N. W. 2d 735.

This case is unlike *Dahl v. Housing Authority, supra,* because specified items of determinable value are not involved. In this case, the question of the degree of substantial performance and its effect on the whole building required determination as a condition precedent to ascertaining values.

The trial court found that Stevens' liquidable claim of January 1, 1970, became unliquidated upon discovery of the yielded beams; a genuine dispute arose as Stevens could not show full performance but was required to establish the degree of substantial performance. We think the trial court's finding was correct. The plaintiff had the burden to prove the degree of substantial performance and no sum certain could be ascertained until trial. We conclude that Stevens is not entitled to prejudgment interest.

*Substantial performance.*

The defendants, in their motion to review, seek a reversal of the trial court's finding that Stevens had substantially performed the contract and awarding final payment to them. The defendants argue that Stevens had not substantially performed its contract and that the entire final payment ($50,000 — 36,313.43 = $13,686.57) should be withheld from them. These contentions are without merit.

The trial court found that the plaintiff had substantially performed its contract. This finding must be sustained on appeal unless clearly erroneous and contrary to the great weight and clear preponderance of the evidence.

This court has defined substantial performance as "an equitable doctrine and constitutes an exception in building contracts to the general rule requiring complete performance." *Kreyer v. Driscoll* (1968), 39 Wis. 2d 540, 544, 159 N. W. 2d 680. If the building contract has met the "essential purpose of the contract," and if other equitable considerations are met, then the contract is substantially performed. *Plante v. Jacobs* (1960), 10 Wis. 2d 567, 103

N. W. 2d 296; *De Sombre v. Bickel* (1963), 18 Wis. 2d 390, 118 N. W. 2d 868.

In the present case the plaintiff contracted to construct a three building 300 unit apartment project at a cost of approximately $3.27 million. The defendants received just that. The apartment project, save for two defects, was completed and is presently occupied. While there were two specific defects present upon completion of the project—only the defect in the prestressed concrete structure is presently an issue—these defects were readily repairable. In fact, such defect as is presently in issue was repaired at a cost of less than one percent of the total contract price or about $24,000. This is an appropriate case to apply the doctrine of substantial compliance.

Since the trial court's finding of substantial performance is correct, the damages recoverable by the defendants is the contract price less the reasonable cost of correcting the defective construction.

"The general rules respecting the measure of damages for defects in the performance of building contracts have been stated many times and are not in dispute. Where there is a breach of the contract, the law attempts to give the parties to the contract exactly what they contracted for or if this is not possible or feasible, then its equivalent in money. Generally, the measure of damages is the cost of correcting the defect or completing the omission and with this money, the aggrieved party can specifically correct the defects and supply the omissions." *W. G. Slugg Seed & Fertilizer v. Paulsen Lumber* (1974), 62 Wis. 2d 220, 225, 226, 214 N. W. 2d 413.

Such was the measure of damages correctly imposed by the trial court. Payment to Stevens of the difference between the final payment under the contract ($50,000) and the damages incurred by the defendants was not error.

Additionally the defendants contend that the trial court erred in limiting their damages to $24,518.63 for the cost of repair as a result of the design error of the prestressed

concrete structure. The actual damages, the defendants contend, were $70,432.76 which were comprised of $39,932.76 for repair work and $30,500 for diminishment of value.

The trial court found, however, that:

"28. The act of the owners in ordering the advancing of the weight burden of the patio deck and directing the architect so to change the plans and specifications was unilateral and Stevens owed no further contractual duty with respect to the prestressed concrete system already installed and had a right to execute the change order given by the owners without reference to the beam capacity in accordance with the new drawings of the architect.

"...

"33. The owners determined to require reconstruction not only sufficient to support the superimposed load shown by the plans and specifications delivered by the owners for execution to Stevens and Concrete Research but also the load added thereto by the owners after the system was already installed.

"34. The cost reasonably and necessarily incurred by the owners in remedying the defect and to have the support conform to that required by the effective original contract was $17,563.48 for wall construction, $606.15 for plumbing changes, $1,099.00 for shoring and $2,250 for engineering, an aggregate of $21,518.63.

"...

"37. The placing of walls and lowering of headroom occasioned by the repair rendered necessary by the defect chargeable to Stevens and Concrete Research reduced the utility and economic value of the basement and the building by diminishing its fair market value by $3,000."

The above findings are supported by the evidence.

Evidence adduced at the trial indicated that the damages incurred by the defendants were the result of the inability of the prestressed concrete beams to support the weight of the original design. When, however, the defendants owners changed the original plans and substituted much heavier planters to be placed upon the

prestressed concrete structure, both the beams and the planks were overtaxed. The trial court concluded, and correctly so, that Stevens was liable only as to the original design—*i.e.*, the beams—and damage resulting from a change in the original design was the responsibility of the defendants—*i.e.*, the planks. Thus, the trial court only imposed upon the plaintiff that amount necessary to correct the original design and required the owners to assume responsibility for the remainder. We agree with the trial court's findings of fact and conclusions of law.

The defendants were required to furnish 44 pages of supplemental abridgement of testimony. Under the record in this case it was essential to do so. The defendants are allowed the statutory cost of such preparation.

*By the Court.*—Judgments affirmed.