M & I MARSHALL & ILSLEY BANK, Plaintiff-Respondent, v. PUMP, and another, Defendants-Appellants: CROWN LIFE INSURANCE COMPANY, Third-party Defendant-Respondent.

Supreme Court

*No. 76–536. Submitted on briefs February 28, 1979.—*
*Decided March 27, 1979.*
(Also reported in 276 N.W.2d 295.)

For the appellants the cause was submitted on the brief of *Sam Pump*, attorney, and *Francis X. Krembs*, of counsel, both of Milwaukee.

For the plaintiff-respondent and third-party defendant-respondent the cause was submitted on the brief of *James A. Urdan, David E. Jarvis, Dwight L. Nye* and *Quarles & Brady* of Milwaukee.

CONNOR T. HANSEN, J.  The third party action is based upon long-term financing commitments the appellants obtained from Crown Life Insurance Company (hereinafter Crown) for a 92-unit, four building apartment project to be constructed by the appellant at Menasha, Wisconsin.  Construction financing for the project was provided by Richter-Schroeder Company (hereinafter Richter), a mortgage banking firm and a loan correspondent of Crown.  Richter was acquired by M & I Marshall & Ilsley Bank (hereinafter Bank) while the construction was in progress.

In two financing commitments dated January 21 and 22, 1974, Crown agreed to lend appellants $1.16 million secured by two first mortgages for $440,000 and $720,000.  These commitments provided that they would be null and void if the transaction was not completed within 253 days, unless extended in writing, at Crown's option.  The commitments required, among other things, as conditions precedent, a title insurance policy without exceptions, payment of outstanding taxes and completion

in strict compliance with the plans and specifications, including landscaping.

The appellants were unable to complete the project by the time the commitments expired in October, 1974, and requested an extension. At the request of the appellants, Crown ultimately agreed to four successive extensions of the commitments, first to December 15, 1974, then to April 15, 1975, then to July 15, 1975, and finally to a one-month extension to August 15, 1975.

During the period of the extensions, the appellants needed funds in addition to the original construction financing for the project. As a result, in June, 1975, the Bank agreed to advance appellants an additional $100,-000, secured by a $250,000 second mortgage. This mortgage also covered a $116,000 rental holdback.

Appellants and Richter began preparations for closing in August, 1975, even though work continued on the project. The architect's certificate of completion was signed August 7th, but the project engineer indicated that this referred to the building itself and not to "odds and ends," such as hardware, carpeting, appliances or cleanup. He further indicated that some of the incomplete items, landscaping among them, were not included in the building plans. He admitted that building code violations existed the day he signed the completion certificate.

The closing did not occur because a title policy had not been obtained and the project was not completed. An inspection of the project on August 13th by Tom Richter showed that although the buildings were structurally finished the following work remained to be done:

1. Installation of appliances, including 28 refrigerators, three stoves and two dishwasher front panels;

2. installation of carpet padding in 35 apartments, and carpeting in 53 apartments;

3. installation of numerous electric fixtures, including those in 31 bathrooms and 21 hallways;

4. installation of numerous doors and door hardware;

5. removal of construction materials from underground garages and installation of garage doors and electric door openers;

6. fifty percent of the exterior painting and installation of some roof flashing;

7. the landscaping; and

8. correction of a number of building code violations, including the addition of fire-resistant materials and doors to the furnace rooms and on the basement stairs in each of the four buildings and the installation of a new ventilating system in the underground parking area in each building.

The building had 20 tenants on August 15th and approximately five more were due to move in.

A title insurance policy was not obtained because construction lien claims had been filed and potential unfiled claims existed. The appellants were also delinquent in real estate taxes.

The first two construction loans had been completely disbursed by June 15, 1975. Advances and draw requests being processed on August 15, 1975, depleted the $100,000 loan from the Bank. Crown's last extension of the commitments expired August 15, 1975. Richter attempted to get a further extension from Crown. However, on September 4, 1975, Crown advised Richter that the commitments would not be reinstated. The Bank then brought this foreclosure action in which the appellants counterclaimed against Crown seeking specific performance of the long-term financing commitments.

In an attempt to show that the commitments' terms could be met the appellants presented evidence at trial that the title company had agreed to provide a policy insuring that Crown's mortgages would have priority status over the filed construction liens if those liens were bonded. A bonding company representative testified

that they agreed to bond the liens but were never given a list of filed liens. However, the testimony of the title company representative, Alan Dolenshek, was contradictory as to whether a policy could be issued which both insured over the bonded filed liens and eliminated the standard unfiled claim exception. Dolenshek did indicate that the liens could have been bonded for 125 to 150 percent of the amount already filed plus 125 percent of the undetermined amount of the unfiled claims. He admitted he didn't know if such a policy would be acceptable to Crown, but said Crown did require a waiver of the unfiled lien exception. A. John Richter testified that generally investors would not accept a title insurance policy with an exception for unfiled liens. There was no evidence that appellants could, in fact, provide such a bond or pay the liens.

The appellants also attempted to show that they understood Crown was extending the commitments on a day-to-day basis after August 15th. A. John Richter actually testified that any mention of short-term or day-to-day extensions referred to the time period prior to August 15th. He said that after August 15th there was no formal agreement or extension, only an informal understanding that if the project wâs completed within a few days that Crown would close. The project was not so completed. Richter indicated that an escrow of $25,000 to complete the carpeting after August 15th would be acceptable, but that they could not consider adding the remaining unfinished items to that escrow. No such escrow was tendered or proof offered that appellants were able to provide an escrow.

Goldman, one of the appellants, testified that they had several lines of credit on which to draw to pay the liens as soon as disputes regarding their amounts were settled. He said that according to their estimates on September 4th approximately $96,000 was needed to pay off the outstanding liens and install the carpeting. Pump

testified that he calculated that they would need about $172,000 to close, including the $116,000 rental hold-back, $8,400 for taxes and $48,000 to be escrowed to cover unfinished items. He said he thought they had $165,000 remaining on the $250,000 second mortgage and the $11,600 standby fee due from Crown at closing. On cross-examination he admitted the second mortgage balance was reduced after August 15th by draw requests.

The accuracy of these figures is challenged by respondents. The 10 percent rental achievement holdback was a provision added by Crown in the extension to July 15th. This sum was to be held back by Crown out of the two mortgages until rental reached 85 percent of stabilized rents. The $11,600 standby fee would be refunded by Crown at closing, but Richter's figures showed that after closing costs were deducted, including interest, tax escrow and attorney's fees, appellants would owe $6,650 over and above the $11,600.

The trial court concluded that time was not of the essence in this transaction and in so doing recognized the general rule that when time is not of the essence, the appellants would be entitled to notice of default and a reasonable time in which to perform.

However, in this case, where the appellants had been granted four extensions and no showing had been made that performance within a reasonable time was practically possible, the trial court concluded notice was not required because it would be a mere formality. To support this conclusion the trial court found that the real estate taxes were in arrears, the cost to complete the project was in excess of $10,000 and acceptable title insurance could not be provided and therefore that Crown was relieved of the commitments after they expired on August 15, 1975. The trial court also found that these breaches were substantial and were of the very essence of the financing commitment agreements.

Although, as previously stated, this appeal is from the judgment of foreclosure, the issue presented relates solely to the judgment of dismissal of the appellants' counterclaim against Crown.

The issue is whether the appellants were entitled to notice fixing a reasonable time for performance after August 15, 1975, before Crown could be relieved of the obligation of the prior commitments. We are of the opinion the trial court correctly decided the issue when it entered judgment dismissing the appellants' counterclaim against Crown.

The parties agree on the general rule as stated in *Stolper Steel Prod. v. Behrens Mfg. Co.*, 10 Wis.2d 478, 486, 487, 103 N.W.2d 683 (1960):

"The rule of law which we deem governs this case is set forth in 1 Black, Rescission and Cancellation (2d ed.), p. 623, sec. 219:

" 'Even where time is made the essence of the contract, this provision may be waived by the party for whose benefit or protection it is inserted, either expressly or by extending the time for payment or performance or by granting indulgence to the other party in this regard; and when such a waiver has been made, he cannot arbitrarily and summarily declare a forfeiture of the contract for delay, but must first demand payment or performance and give the other party a reasonable time and opportunity, after such demand, to comply.'

"This same principle is stated in 17 C.J.S., Contracts, p. 918, sec. 435, as follows:

" 'So where time for performance has been extended with no intention manifested to hold to literal performance, or a provision wherein time is made of the essence is waived, notification and a reasonable time for compliance are necessary.' "

This court has recognized the rule both where a time is of the essence provision has been waived and where timely performance was not required by the contract.

*Stolper, supra,* and *Haislmaier v. Zache,* 25 Wis.2d 376, 130 N.W.2d 801 (1964). When Crown granted the extensions requested by the appellants, none of them stated that time was of the essence. The respondents do not seriously challenge the finding of the trial court that time was not of the essence. Instead, they direct their attention to the exception relied upon by the trial court in its determination that under the facts of this case no notice was necessary.

The greater weight of the evidence in this case supports the finding that the appellants were in substantial default. Certainly it cannot be said that such finding is against the great weight and clear preponderance of the evidence. The original completion date requirement in Crown's commitments was October, 1974. At the request of the appellants, Crown gave them until August 15, 1975, to perform. They did not so perform. *Ochiltree v. Kaiser,* 20 Wis.2d 191, 121 N.W.2d 890 (1963).

The exception to the general rule is concisely set forth in 17A C.J.S., *Contracts,* sec. 435 (1963), as follows:

*"Failure to perform.* If a party means to rescind a contract because of the failure to the other party to perform it, he should give a clear notice of his intention to do so; and where time is not of the essence of the contract he must give the other party a reasonable time thereafter to comply, unless the contract itself dispenses with such notice or unless notice becomes unnecessary by reason of the conduct of the parties. However, notice of intention to rescind is necessary only where the party has merely delayed performance, and not where he has abandoned the contract, or treated it as terminated, or where he has refused to perform; nor does the rule apply where fraud in the procurement of the contract is alleged.

"Likewise, where time for performance has been extended with no intention manifested to hold to literal performance, or a provision wherein time is made of the essence is waived, notification and a reasonable time

for compliance are necessary. Where performance as contemplated is no longer possible, a party may rescind without permitting further time for performance."[1]

Also at 17A, C.J.S., *Contracts,* sec. 478(b), it is stated:

"A demand for a performance is unnecessary where it is apparent that it would be unavailing or constitute a useless formality, . . . Thus a demand for performance is unnecessary where there has been a prior absolute refusal or repudiation, or where the party from whom performance is due has placed it out of his power to perform, or has demonstrated his inability to perform, or where demand has been waived."

Time and additional funding were necessary for the appellants to complete this building project. There is nothing in the record from which an inference could be drawn that the appellants had refused to complete the building or that it was physically impossible to complete it. The difficulty is that after the appellants had been accommodated by having the original commitments extended four times, they had been unable to complete the project or provide acceptable title insurance.

The trial court evaluated the breach by enumerating the construction and work that remained to be done under the terms of the commitments. This unfinished construction work, when considered with the facts that this was a contract to provide long-term financing and that the appellants were already almost a year overdue in completing the project, had been forced to obtain additional financing during this period, were delinquent in real estate tax payments, were disputing the amount owed on lien claims, and were unable to provide acceptable title insurance, amply supports the finding of the trial court that the appellants were in substantial de-

[1] *See: Guentner v. Gnagi,* 258 Wis. 383, 391, 392, 46 N.W.2d 194 (1951).

fault. The appellants were well aware of the fact that the last extension of the commitment would expire on August 15, 1975, and that their last extension had been limited to one month.

The appellants contend that they had substantially performed the construction project. But this is not the issue. The issue is whether they had substantially breached the terms of the financing commitment contract and Crown was thereby relieved of giving them notice that it would not extend the agreement a fifth time and afford appellants a reasonable time to complete the project. A party has substantially performed if he has met the essential purpose of the contract. *Id.* In *Appleton State Bank v. Lee,* 33 Wis.2d 690, 148 N.W.2d 1 (1967), the court said factors to be considered included the character of the promised performance, the purposes it was expected to serve and the extent to which nonperformance has defeated those purposes.

This is a financing contract, where the closing actually begins a long-term relationship between the parties rather than ending one. Circumstances such as those presented here do not require the giving of a notice that the commitment will not be further extended or that the appellants be given additional time to comply with the contract provisions. This is not a situation in which a short additional extension of time would result in the transfer of a building with no further financial involvement of the parties. In that situation, where the court need only compute the completion costs and award damages, the delay in completion might not be considered a material breach. Here, when the project was finally completed and evidence of acceptable title available, Crown would be obligated to pay $1.16 million and receive repayment over an extended period of time. The

long delay and inability to perform clearly present a material breach.

The trial court made detailed and complete findings of fact which support its conclusions of law. The findings of fact will be sustained unless they are against the great weight and clear preponderance of the evidence. *Stevens Construction Corp. v. Carolina Corp.*, 63 Wis.2d 342, 359, 217 N.W.2d 291 (1974). The findings here are not against the great weight and clear preponderance of the evidence and the judgment is affirmed.

*By the Court.*—Judgment affirmed.

DAY and COFFEY, JJ., took no part.