COURT OF APPEALS
DECISION
DATED AND FILED

June 8, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2020AP336**

STATE OF WISCONSIN

Cir. Ct. No.  2017CV845

IN COURT OF APPEALS
DISTRICT III

KOEHNE CHEVROLET-BUICK-GMC, INC.,

   PLAINTIFF-APPELLANT,

 V.

BAYLAND BUILDINGS, INC.,

   DEFENDANT-RESPONDENT.

APPEAL from a judgment of the circuit court for Brown County: TIMOTHY A. HINKFUSS, Judge. *Reversed and cause remanded for further proceedings.*

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1　PER CURIAM. Koehne Chevrolet-Buick-GMC, Inc., appeals a summary judgment granted in favor of Bayland Buildings, Inc., on Koehne's breach of contract and breach of warranty claims. We conclude there are genuine issues of material fact that preclude summary judgment on those claims. Accordingly, we reverse and remand for further proceedings.

## BACKGROUND

¶2　Koehne and Bayland entered into a design-build contract on February 9, 2014, for the construction of a new automobile dealership in Marinette, Wisconsin. The contract anticipated that Bayland would design and build, among other things, a new service and parts building. Although the contract included detailed specifications that included building materials, finishes, and plumbing, electric and HVAC systems, it did not include a design, final or otherwise, for the service center or other buildings. Rather, the contract stated that there would be "detailed plans provided for structure construction." The contract also required "owner approval on final floor plans."

¶3　Bayland assumed the roles of project manager and general contractor, and it bound itself to the following contractual obligation: "Workmanship shall be completed in professional-like manner according to the industry standard practice." A warranty provision in the contract stated: "We will make any repair, replacement or correction as shall become necessary by reason of faulty workmanship or material, which appears within three … years from occupancy or completion, whichever comes first."

¶4　After the service center's construction, Koehne discovered it was too small to fit, for functional use, the desired number of service bays containing vehicle lifts of the type Koehne intended to use. Koehne had intended to have

fourteen service bays, seven on each side of the building. In those bays, Koehne intended to have a third party install twelve two-post, above-ground lifts manufactured by Rotary, which were a combination of lifts it was bringing from the old service facility and several new lifts it had purchased. Koehne intended to use one of the remaining bays for an alignment rack and the other as a "dry bay."

¶5 Koehne then filed the present lawsuit against Bayland, asserting breach of contract and breach of warranty claims.[1] Koehne alleged that the service center, as constructed, was able to accommodate only twelve bays and eleven lifts. Koehne further asserted that the new lift configuration caused the facility's exhaust ventilation hoses to be misaligned such that they hang over the tops of cars.

¶6 Bayland filed a motion for summary judgment on both of Koehne's claims. As relevant here, Bayland argued that it had fulfilled all of its contractual obligations to Koehne and, therefore, it had also acted in accordance with its warranty obligations. Specifically, Bayland maintained that the contract did not specify a width for the vehicle lift bays and that Koehne had accepted Bayland's design proposal with fourteen twelve-foot-wide bays. Bayland asserts it was evident from the overall building dimensions identified on the plans that the bays would be less than fourteen feet wide. Bayland argued that the only directive it had received from Koehne regarding the bay size was "to make sure that [its] hoists would fit" and it had achieved that goal, albeit with mere inches to spare on either side of the lifts.

---

[1] The claims against all other parties were dismissed by stipulation.

¶7      The circuit court granted Bayland's summary judgment motion.  It concluded that the design-build contract was unambiguous and did not specify Koehne's desired dimensions or spacing of the service bays.  Moreover, the court determined that to the extent there were extra-contractual requests made regarding the design of the service bays, those requests could not form the basis for a breach of contract claim because Koehne had approved the plans.  According to the court, "[c]reating the service shop to accommodate twelve-foot[-]wide stalls sufficiently completed what Bayland undertook to do and additionally satisfied industry standards."  In so holding, the court emphasized that twelve-foot-wide service stalls satisfied the minimum width requirements provided by the lift manufacturer, Rotary.  Based upon the court's contractual analysis, it determined that Koehne's warranty claim also failed, as "Bayland did not produce any faulty workmanship in their construction of the service shop."[2]  Koehne now appeals.

## DISCUSSION

¶8      We review a grant of summary judgment de novo.  *Duncan v. Asset Recovery Specialists, Inc.*, 2020 WI App 54, ¶9, 393 Wis. 2d 814, 948 N.W.2d 419.  Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  WIS. STAT. § 802.08(2) (2019-20).  "To make a prima facie case for summary judgment, a moving [party] must show a defense which would defeat the claim."  *Preloznik v. City of Madison*, 113 Wis. 2d 112, 116, 334 N.W.2d 580 (Ct. App.

---

[2]  The circuit court partially denied Bayland's motion for summary judgment on several warranty issues other than the misalignment of the exhaust hoses.  The court dismissed those remaining claims upon stipulation of the parties and entered a final judgment for purposes of appeal.

1983). If the moving party has made such a showing, we examine the evidentiary materials submitted by the opposing party to determine whether a genuine issue exists as to any material fact. *Id.* "In evaluating the evidence, we draw all reasonable inferences from the evidence in the light most favorable to the non-moving party." *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶40, 294 Wis. 2d 274, 717 N.W.2d 781.

¶9      A breach of contract claim requires proof of three elements: (1) a contract between the plaintiff and the defendant; (2) failure of the defendant to do what it undertook to do; and (3) damages. *See Brew City Redevelopment Grp., LLC v. The Ferchill Grp.*, 2006 WI App 39, ¶11, 289 Wis. 2d 795, 714 N.W.2d 582. Bayland's motion for summary judgment asserted that no breach of contract claim may lie because it performed every promise it made in the design-build agreement and Koehne approved its design plans for the service center. We conclude that Koehne has presented sufficient evidence to create a genuine issue of material fact as to whether Bayland satisfied its obligations under the contract— in particular, whether Bayland completed its work in a professional-like manner and in accordance with industry standards.

¶10     Bayland argues that because the design-build contract did not call for a particular width for the service bays and because Bayland "had no obligations regarding the service lifts," it cannot be held to have breached the contract as a matter of law. We disagree. Per the contract, Bayland's obligation was to supply Koehne with detailed construction plans. Bayland was required under the contract to create those plans "in [a] professional-like manner according to the industry standard practice." Bayland's design services were the very subject matter of the contract, and the fact that the parties had not agreed to a final design

plan at the time the contract was signed does not relieve Bayland of its obligation to adhere to the standards of care set forth in the contract.

¶11    Bayland argues that the undisputed evidence shows it satisfied those standards of care.  Specifically, it contends that its decision to design twelve-foot service bays rather than fourteen-foot service bays was in accordance with the minimum manufacturer guidelines for the Rotary lifts, and this fact alone establishes that its design was within accepted industry standards.[3]

¶12    In opposition to summary judgment, however, Koehne presented a report from architect, J. Howard Nudell.[4]  Nudell opined that in setting forth the minimum twelve-foot width, the Rotary guidelines contain no information "as to the location of the bay or if it is in a commercial garage or private garage or if there is an adjacent bay or bays with or without a lift in it."  Nudell stated there are no "golden rules" when it comes to auto lift positioning, but it is difficult to maneuver around a lift with less than two feet of space on each of its sides.  Moreover, he quoted from a Rotary resource guide that specifically addressed two-post, above-ground lifts like those Koehne desired to install:

> Two post surface lifts, on the other hand, give technicians only seven inches of clearance between base plates when they are installed next to each other in 12-foot bays.  That's not enough room for technicians to walk from [the] front to the back of the vehicle when its [sic] not in the air.  When

---

[3]  The minimum bay width for Rotary's two-post, above-ground lifts is twelve feet.  The circuit court observed that Bayland was unaware of the manufacturer guidelines until after the building had been constructed.  Nonetheless, the guidelines are evidence that would support a determination that Bayland did not breach its duties under the contract, but, as we explain, there was other evidence that would support a contrary determination.

[4]  The circuit court found that Nudell was "undoubtedly qualified to present his opinions, and his testimony would be admissible at trial."

lifts are too close to each other, there is also an increased risk of vehicle doors hitting each other.

¶13    Likewise, Bayland's assertion that it had no knowledge of, or responsibility for, the vehicle lifts is insufficient to establish as a matter of law that it cannot be held liable for a breach of contract under the circumstances here.  One of Koehne's principals testified that he told his contact at Bayland, Jim Rogers, "from the beginning" that the new facility required fourteen bays.  He testified he also told Rogers "to make sure that my hoists would fit."  There was evidence that Rogers later admitted at a meeting that he knew he was supposed to measure Koehne's existing lifts, but he failed to do so.

¶14    Bayland's architect, David Lintz, testified that he was not told, and did not ask, whether Koehne intended to use above-ground or in-ground lifts.[5] Lintz assumed Koehne would use in-ground lifts.  Nudell opined that Bayland and Lintz's failure to visit Koehne's old service facility "to verify existing stall sizes or the type of lifts to be relocated" was a material omission that breached the duty of professionalism.  Similarly, Nudell concluded "Bayland and/or Lintz had a responsibility to measure the bays in the old dealership and to know what type of lifts were being transferred."

¶15    Nudell also opined that the plans Lintz and Bayland prepared for the service center breached the standards of care contained in the contract.  In

_____

[5] According to Nudell, the two types of lifts most often used are in-ground and above-ground.  An in-ground lift has one or two "posts" in the ground within the bay that lift the vehicle and is narrower than an above-ground lift.  Whereas an in-ground lift installed in a twelve-foot bay would have an approximate two-foot area on either side that a technician could walk around, a two-post, above-ground lift installed in a twelve-foot bay would "not [have] enough room between stalls for a tech to easily and safely walk between the stalls because of the posts."

particular, Lintz admitted that none of the drawings he prepared contained a notation that it was depicting in-ground lifts. Nor did Lintz ever advise Bayland or Koehne that the drawings depicted in-ground lifts. Nudell concluded: "[T]he bays on Bayland's drawings were not laid out to industry applicable standards based on using some of Koehne's existing lifts plus their new ones. Industry applicable standards as discussed above for 2-post above ground lifts provide[] for at least 2' between the posts or 14' wide bays."

¶16 Bayland asserts summary judgment was appropriate because Koehne undisputedly approved the design plans prior to construction. As the circuit court noted, it is generally held that a party to a construction contract must object at the earliest time practicable to avoid "causing undue and unreasonable expense" to the contractor. *See Laycock v. Parker*, 103 Wis. 161, 175, 79 N.W. 327 (1899). Moreover, the contract here required Koehne to approve the final floor plans. As a result, Bayland argues that Koehne has forfeited its right to challenge the allegedly deficient work. *See Stevens Constr. Corp. v. Carolina Corp.*, 63 Wis. 2d 342, 356, 217 N.W.2d 291 (1974).

¶17 The rule regarding forfeiture upon owner approval is limited to "obvious defects" that should have been promptly and properly rejected. *Id.* The parties agree the following statement from *Stevens* is a correct statement of the law: "If the defects are hidden or latent and thus under the exercise of reasonable diligence unknown to the owner or architect, there cannot be implied a waiver on the part of the owner of construction defects." *Id.* at 357. Koehne asserts that "Bayland's depiction of the wrong lifts in the plans had the effect of hiding the error with respect to the sizing of the service bays so that it would not be apparent to Koehne."

¶18    We conclude there is a genuine issue of material fact regarding whether the sizing problem with the service bays was hidden or latent, such that Koehne should be deemed to have forfeited its breach of contract claim. Bayland's only argument on this point, which was accepted by the circuit court, is that Koehne knew that the overall size of the proposed service center was ninety-three feet based on one of the drawings Bayland presented. From this fact, Bayland reasons that Koehne "only needed to perform simple divisional math to understand that the service bays would be less tha[n] 14-feet wide given the service department['s] contractual dimensions."[6]

¶19    The drawing Bayland references, however, fails to clearly indicate that in-ground lifts are depicted. As noted above, the type of lift depicted was never communicated to Koehne, nor is there evidence that Koehne was told that, as designed, there would be mere inches of space between the lifts. Indeed, Nudell opined that Lintz breached the duty of care based upon Lintz's testimony that he did not do any research into the spacing required between lifts or service bays. And while the overall building dimension is included on one of the plans,[7] Bayland does not argue that any of the plans depicted a twelve-foot width for each

---

[6] The electronic appellate record contains the design drawing Bayland references, but the notations of measurement are not legible on the electronic copy. Nonetheless, Koehne concedes that one of the plan drawings it received included the overall dimensions of the service area (although it notes that subsequent drawings did not include such notations). Accordingly, we accept, for purposes of this opinion, that at least one of the drawings Bayland provided Koehne contained the overall service center dimensions, such that the calculation Bayland proposes would have been feasible. Given the evidence of record, however, a genuine issue of material fact exists as to whether Koehne was, or should have been, aware that the service bays were not adequately sized for its needs.

[7] As Koehne points out, Bayland's reliance on the overall structure size identified in the contract itself is unavailing insomuch as two sides of the service center were set at 118 feet. We agree with Koehne's arguments in this regard, for the reasons stated in Koehne's reply brief.

service bay. Accordingly, we agree with Koehne that whether it "should have caught or known that Bayland incorrectly depicted in-ground lifts or, as Bayland suggests, should have performed divisional math to determine there was not sufficient spacing, irrespective of Bayland's error, is for the jury to resolve."

¶20 There also exist genuine issues of material fact that preclude summary judgment on Koehne's breach of warranty claim. An express warranty claim requires proof of: (1) an affirmation of fact; (2) inducement to the buyer; and (3) reliance thereon by the buyer. *Selzer v. Brunsell Bros., Ltd.*, 2002 WI App 232, ¶13, 257 Wis. 2d 809, 652 N.W.2d 806. The contract's warranty provision stated: "We will make any repair, replacement or correction as shall become necessary by reason of faulty workmanship or material, which appears within three … years from occupancy or completion, whichever comes first." Bayland asserts that summary judgment was appropriate on Koehne's breach of warranty claim because "the final placement of the exhaust hoses was consistent with the design plans and specifications as approved by Koehne."

¶21 Whether the placement of the hoses was "faulty workmanship" is essentially derivative of Koehne's breach of contract claim. We note that a contractor's poor judgment can constitute faulty workmanship. *See Gussert v. Green Bay Home Bldg. Co.*, 240 Wis. 238, 241, 3 N.W.2d 384 (1942). If Bayland did not exercise professional care in designing the facility to industry standards, then the placement of the exhaust hoses was also problematic and Bayland can be liable for its correction under the warranty provision. If, however, Bayland is found to have adhered to the standard of care in designing the location of the bays, or if Koehne has forfeited its right to challenge the design by virtue of having signed off on it, then the placement of hoses cannot constitute faulty workmanship for purposes of the warranty.

¶22 Finally, the parties vigorously dispute whether the design-build contract is ambiguous. A nonintegrated contract that includes design services as its subject matter is not expected to address every detail of plans that have not yet been developed at the time of its execution. *Cf. **Webb v. R.O.A. Gen. Inc.**,* 804 P.2d 547, 551 (Utah Ct. App. 1991) ("A nonintegrated contract may exist where the terms are not ambiguous, but the nature of the agreement itself is unclear."). Accordingly, we do not perceive the parties' arguments regarding ambiguity to be pertinent to the issue at hand regarding whether summary judgment was proper. Both parties introduced evidence outside the "four corners" of the contract as part of the summary judgment proceedings, and we therefore conclude the dispute is not limited to the contents of the design-build contract alone. *See **Stevens**,* 63 Wis. 2d at 354.

*By the Court.*—Judgment reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2019-20).